No. 25-10297

# In the United States Court of Appeals for the Fifth Circuit

LATRISHA WINDER, INDIVIDUALLY, AS NEXT FRIEND OF J.W., A MINOR,
AND AS PERSONAL REPRESENTATIVE OF THE ESTATE OF STEPHEN WAYNE
WINDER, DECEASED; LILY WINDER; STEPHEN TYLER WINDER;
EMMA WINDER; LOU ANNE PHILLIPS,

*Plaintiffs-Appellants,*

v.

UNITED STATES OF AMERICA,

*Defendant-Appellee.*

On Appeal from the United States District Court for the
Northern District of Texas, Wichita Falls Division
No. 7:24-cv-00083, Hon. Reed C. O'Connor

**BRIEF *AMICI CURIAE* OF THE JURISDICTION OF THE
ARMED FORCES AND CHAPLAINCY FOR THE ANGLICAN
CHURCH IN NORTH AMERICA, THE ALEPH INSTITUTE, THE
LUTHERAN CHURCH—MISSOURI SYNOD MINISTRY TO THE
ARMED FORCES, AND THE CHAPLAIN ALLIANCE FOR
RELIGIOUS LIBERTY IN SUPPORT OF
DEFENDANT-APPELLEE AND AFFIRMANCE**

DANIEL H. BLOMBERG
MICHAEL J. O'BRIEN
  *Counsel of Record*
AMANDA L. SALZ
THE BECKET FUND FOR
  RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW,
  Suite 400
Washington, D.C. 20006
mobrien@becketfund.org

*Counsel for* Amici Curiae

## CERTIFICATE OF INTERESTED PERSONS

Counsel of record certifies that the following persons and entities as described in 5th Cir. R. 28.2.1 and 5th Cir. R. 29.2 have an interest in the amicus brief.

| Plaintiffs-Appellants | Counsel for Plaintiffs-Appellants |
|---|---|
| • Latrisha Winder, Individually, as Next Friend of J.W., a minor and as Personal Representative of the Estate of Stephen Wayne Winder, Deceased<br>• Lily Winder<br>• Stephen Tyler Winder<br>• Emma Winder<br>• Lou Anne Phillips | Curnutt & Hafer, L.L.P.<br>• Stephen W. Kotara<br>• Douglas R. Hafer |

| Defendant-Appellee | Counsel for Defendant-Appellee |
|---|---|
| • United States of America | U.S. Attorney's Office, Northern District of Texas<br>• Andrea Lena Hyatt |

| *Amici Curiae* | Counsel for<br>*Amici Curiae* |
| --- | --- |
| • The Jurisdiction of the Armed Forces and Chaplaincy for the Anglican Church in North America<br>• The Aleph Institute<br>• The Lutheran Church—Missouri Synod Ministry to the Armed Forces<br>• The Chaplain Alliance for Religious Liberty | The Becket Fund for Religious Liberty<br>• Daniel H. Blomberg<br>• Michael J. O'Brien<br>• Amanda L. Salz |

/s/ *Michael J. O'Brien*
MICHAEL J. O'BRIEN
*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Amici Curiae the Jurisdiction of the Armed Forces and Chaplaincy for the Anglican Church in North America, the Aleph Institute, the Lutheran Church—Missouri Synod Ministry to the Armed Forces, and the Chaplain Alliance for Religious Liberty are non-profit 501(c)(3) organizations and have no corporate parent and are not owned in whole or in part by any publicly held corporation.

# TABLE OF CONTENTS

**Page(s)**

CERTIFICATE OF INTERESTED PERSONS ........................................ii

CORPORATE DISCLOSURE STATEMENT ........................................iv

TABLE OF AUTHORITIES ...................................................vii

INTEREST OF THE *AMICI CURIAE*....................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ..........................2

ARGUMENT ...................................................................................4

   I. The U.S. military's history and modern practices
     confirm that chaplains' status and functions are
     inherently religious. ........................................................4

     A. The chaplaincy exists to serve soldiers' religious needs. ...........5

     B. Chaplains serve as formal ecclesiastical representatives
       of their particular faith groups....................................6

     C. Chaplains' functions are religious in nature...............................9

  II. The church autonomy doctrine operates as a threshold
     constitutional limitation on judicial interference
     in religious matters. ....................................................10

     A. The church autonomy doctrine is a structural
       limitation on the power of the government in
       religious matters.........................................................11

     B. Addressing church autonomy issues at the
       threshold is necessary to avoid crossing structural
       church-state lines. .....................................................13

  III. The church autonomy doctrine bars the claims in
      this case. ......................................................................16

A. The church autonomy doctrine bars Appellants' negligent-chaplain-counseling claims........................17

    1. The church autonomy doctrine bars tort claims that interfere in religious matters...........................18

    2. Appellants' negligent-chaplain-counseling tort claims are barred by church autonomy.......................19

B. The "formal title" or "neutral principles" approach is a tool meant to serve church autonomy—not swallow it........................................25

    1. Appellants' property rule is inapplicable............................25

    2. Appellants mistake this Court's precedent.........................28

CONCLUSION ...........................................30

CERTIFICATE OF SERVICE.................................31

CERTIFICATE OF COMPLIANCE........................................31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Billard v. Charlotte Catholic High Sch.,*
101 F.4th 316 (4th Cir. 2024) ................................................ 12, 13, 15

*Bryce v. Episcopal Church,*
289 F.3d 648 (10th Cir. 2002) ......................................................... 3, 14

*C.L. Westbrook, Jr. v. Penley,*
231 S.W.3d 389 (Tex. 2007) ............................................. 13, 18, 24, 26

*Cannata v. Catholic Diocese of Austin,*
700 F.3d 169 (5th Cir. 2012) .............................................................. 14

*Capron v. Van Noorden,*
6 U.S. (2 Cranch) 126 (1804) ............................................................ 15

*Catholic Charities Bureau v. Wisconsin,*
145 S. Ct. 1583 (2025) ............................................................ 3, 11, 12

*Combs v. Cent. Tex. Ann. Conf.,*
173 F.3d 343 (5th Cir. 1999) .............................................................. 13

*County of Allegheny v. ACLU,*
492 U.S. 573 (1989) ............................................................................ 29

*Conlon v. InterVarsity Christian Fellowship/USA,*
777 F.3d 829 (6th Cir. 2015) ....................................................... 13, 15

*Corp. of Presiding Bishop v. Amos,*
483 U.S. 327 (1987) ............................................................................ 24

*Cutter v. Wilkinson,*
544 U.S. 709 (2005) .............................................................................. 5

*Demkovich v. St. Andrew the Apostle Parish,*
3 F.4th 968 (7th Cir. 2021) ....................................................... 3, 14, 21

*In re Diocese of Lubbock,*
    624 S.W.3d 506 (Tex. 2021) ......................................................... 14, 24

*EEOC v. Catholic Univ.,*
    83 F.3d 455 (D.C. Cir. 1996) ................................................................ 15

*Freedom from Religion Found. v. Mack,*
    49 F.4th 941 (5th Cir. 2022) ................................................................ 29

*Garber v. Scott,*
    525 S.W.2d 114 (Mo. Ct. App. 1975).................................................... 18

*Hosanna-Tabor Evangelical Lutheran Church & School v.*
    *EEOC,*
    565 U.S. 171 (2012).................................................................... *passim*

*Huntsman v. Corp. of the President of The Church of Jesus*
    *Christ of Latter-day Saints,*
    127 F.4th 784 (9th Cir. 2025) ...................................................... *passim*

*Hutchison v. Thomas,*
    789 F.2d 392 (6th Cir. 1986)................................................................ 27

*IHS Cedars Treatment Ctr. of DeSoto, Tex. v. Mason,*
    143 S.W.3d 794 (Tex. 2004) ................................................................ 20

*Johnson v. Collier,*
    137 F.4th 376 (5th Cir. 2025) .............................................................. 14

*Jones v. Wolf,*
    443 U.S. 595 (1979)............................................................................. 26

*Katcoff v. Marsh,*
    755 F.2d 223 (2d Cir. 1985) ......................................................... 5, 6, 9

*Kennedy v. Bremerton Sch. Dist.,*
    597 U.S. 507 (2022)............................................................................. 29

*Kirby v. Lexington Theological Seminary,*
    426 S.W.3d 597 (Ky. 2014)................................................................. 13

*Lee v. Sixth Mount Zion Baptist Church*,
 903 F.3d 113 (3d Cir. 2018) ............................................................. 15

*Marchese v. St. Martha's Roman Catholic Church*,
 965 N.Y.S.2d 557 (N.Y. App. Div. 2013) ........................................... 18

*Markel v. Union of Orthodox Jewish Congregations*,
 124 F.4th 796 (9th Cir. 2024) ................................................. 14, 21, 22

*McRaney v. NAMB*,
 966 F.3d 346 (5th Cir. 2020) .................................................... 11, 29, 30

*McRaney v. NAMB*,
 980 F.3d 1066 (5th Cir. 2020) ....................................................... 11, 12

*Md. & Va. Eldership of Churches of God v. Church of God at Sharpsburg*,
 396 U.S. 367 (1970) ......................................................................... 25

*NLRB v. Catholic Bishop of Chi.*,
 440 U.S. 490 (1979) ..................................................................... 21-22

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
 591 U.S. 732 (2020) .................................................................. *passim*

*Paul v. Watchtower Bible & Tract Soc'y of N.Y.*,
 819 F.2d 875 (9th Cir. 1987) ............................................................ 19

*Payne-Elliott v. Roman Catholic Archdiocese of Indianapolis*,
 193 N.E.3d 1009 (Ind. 2022) ............................................................ 19

*Petruska v. Gannon Univ.*,
 462 F.3d 294 (3d Cir. 2006) ............................................................. 16

*Pfeil v. St. Matthews Evangelical Lutheran Church*,
 877 N.W.2d 528 (Minn. 2016) ..................................................... 21, 24

*Presbyterian Church v. Blue Hull Mem'l Presbyterian Church*,
 393 U.S. 440 (1969) ......................................................................... 26

*Ramirez v. Collier,*
    595 U.S. 411 (2022) ............................................................................ 10

*Sanders v. Casa View Baptist Church,*
    134 F.3d 331 (5th Cir. 1998) ..................................................... 28, 29

*Serbian E. Orthodox Diocese for U.S. & Can. v. Milivojevich,*
    426 U.S. 696 (1976) ........................................................... 20, 26, 27

*Simpson v. Wells Lamont Corp.,*
    494 F.2d 490 (5th Cir. 1974) ..................................... 18, 25, 27

*St. Joseph Catholic Orphan Soc'y v. Edwards,*
    449 S.W.3d 727 (Ky. 2014) .................................................... 14

*Starkey v. Roman Catholic Archdiocese of Indianapolis,*
    41 F.4th 931 (7th Cir. 2022) ................................................ 19

*Tomic v. Catholic Diocese of Peoria,*
    442 F.3d 1036 (7th Cir. 2006) .............................................. 15

*U.S. Navy Seals 1-26 v. Biden,*
    27 F.4th 336 (5th Cir. 2022) ................................................... 6

*United States v. Trump,*
    91 F.4th 1173 (D.C. Cir. 2024) .............................................. 15

*United States v. Villamonte-Marquez,*
    462 U.S. 579 (1983) ................................................................. 5

*Watson v. Jones,*
    80 U.S. (13 Wall.) 679 (1872) ............................................... 11

*Whole Woman's Health v. Smith,*
    896 F.3d 362 (5th Cir. 2018) ..................................... *passim*

*Winder v. Gallardo,*
    118 F.4th 638 (5th Cir. 2024) ............................................... 16

**Statutes**

10 U.S.C. § 7073 ...................................................................... 5

10 U.S.C. § 7217 .................................................................9

10 U.S.C. § 8221 .................................................................8

10 U.S.C. § 9217 .................................................................9

28 U.S.C. § 1292 ...............................................................14

1983 *Code of Canon Law* ..................................................7

Act of July 22, 1861, ch. IX, 12 Stat. 270...........................7

An Act Regulating the Staff of the Army, ch. 61, § 2, 3 Stat.
    426 (1818)...................................................................6

National Defense Authorization Act for Fiscal Year 2013,
    Pub. L. No. 112-239 (2013) ....................................6, 23

## Other Authorities

Cong. Globe, 25th Cong., 1st Sess. 134 (1838)...................6

DoD Directive 1304.19 (effective June 11, 2004)..............7, 8

DoDI 1300.17 (effective Sep. 1, 2020), ..............................6

DoDI 1304.28 (effective May 8, 2024) .............................22

*Matthew* ..........................................................................12

Michael W. McConnell & Luke W. Goodrich, *On Resolving
    Church Property Disputes*, 58 Ariz. L. Rev. (2016) ......25, 26

1 Medical Department, United States Army, *Neuropsychia-
    try in World War II: Zone of Interior* (1966).............9, 10

2 Herman A. Norton, *The United States Army Chaplaincy
    1791-1865* (1977)........................................................9

1 Anson Phelps Stokes, *Church and State in the United
    States* 268 (1950)........................................................5

1 Parker C. Thompson, *From Its European Antecedents to 1791: The United States Army Chaplaincy* xi (1978),......................5, 9

U.S. Dep't of the Army, Army Techniques Publication 1-05.04 (Mar. 23, 2017) ...........................................................23

U.S. Dep't of the Army, Field Manual 3-83 (1-05) (Apr. 11, 2025),....................................................................22

U.S. Dep't of the Army, Pam. 600-3 (b)(6) (Dec. 3, 2014) ......................22

U.S. Dep't of the Army, Army Reg. 165-1 (effective July 23, 2015),............................................. 7, 8, 9, 10, 22, 23

U.S. Dep't of the Army, Army Reg. 600-20 (effective July 24, 2020),.......................................................8

U.S. Dep't of the Army, Army Reg. 600-92 (effective Sep. 8, 2023) ......................................................23

U.S. Dep't of War, Army Reg. 60-5 (Feb. 15, 1924) .................................6

Lael Weinberger, *Is Church Autonomy Jurisdictional?*, 54 Loy. U. Chi. L.J. 471 (2022)................................................12

## INTEREST OF THE *AMICI CURIAE*

Amici are the Jurisdiction of the Armed Forces and Chaplaincy for the Anglican Church in North America, the Aleph Institute, the Lutheran Church—Missouri Synod Ministry to the Armed Forces, and the Chaplain Alliance for Religious Liberty. As explained in their motion for leave, Amici have extensive experience with the issues in this case and are responsible for chaplains serving in the U.S. military who would be harmed by acceptance of Appellants' arguments.[1]

---

[1]    No counsel for a party authored this brief in whole or in part, and no person other than Amici, their members, or their counsel made a monetary contribution to fund the brief's preparation or submission. This brief has been submitted with a motion for leave to file it.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Since the Founding, the U.S. Army has met the religious needs of its soldiers through its chaplaincy corps. Army chaplains have nurtured the living, cared for the wounded, and honored the fallen on behalf of a grateful nation for 250 years. Chaplain ministry takes a variety of forms, including leading religious services, celebrating sacraments, and officiating burials. It also includes pastoral counseling: private, personal guidance provided from a chaplain's religious perspective to soldiers who voluntarily seek it. But now—for the first time in our nation's history—Appellants seek to have a federal appellate court impose tort liability for counseling provided by a chaplain sought out for private spiritual guidance, who counseled on matters of obvious religious significance: marital fidelity, substance abuse, and self-harm.

As the district court correctly held, accepting that novel invitation would violate the First Amendment. Making judges and juries second-guess the content of a chaplain's counsel inevitably chills religious speech, subverts the freedom of religious bodies to provide ministry to soldiers who seek it, and entangles the judiciary in inherently religious matters. All of which would harm chaplains and the soldiers they serve.

The chaplaincy's religious mission is woven into the Army's well-worn fabric. Like the chaplains commissioned by then-Colonel George Washington, modern Army chaplains play two roles, at once commissioned officers and religious leaders. But by design, they are religious leaders first.

2

At all times, chaplains represent the ecclesiastical bodies that certify them to the Army as religious representatives fit to provide pastoral care. When they render counseling, they do so as pastors, priests, rabbis, or imams of their own faith groups. A chaplain's counsel is religious counsel.

The First Amendment's church autonomy doctrine places a structural protection around chaplains' performance of such fundamentally ecclesiastical functions.[2] This protection ensures that the Church—and not the State—can freely decide core matters of faith, doctrine, and internal church governance. And it requires courts to dismiss cases like this one at the threshold, preventing litigants from employing judicial power to pry into chaplain counseling sessions and parse the sacred from the secular.

That's exactly what Appellants ask this Court to do. They argue that courts can determine that some of a chaplain's oral guidance in a single counseling session is obviously "spiritual" (like marital fidelity) and some of it is "purely secular" (like marital concerns over spousal self-harm). And they argue that the latter is susceptible to liability under "neutral" tort laws.

---

[2] The district court used the term "ecclesiastical abstention." The Supreme Court instead uses "church autonomy." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732 (2020); *Catholic Charities Bureau v. Wisconsin*, 145 S. Ct. 1583 (2025). So do other federal appellate courts. *See, e.g.*, *Huntsman v. Corp. of the President of The Church of Jesus Christ of Latter-day Saints*, 127 F.4th 784 (9th Cir. 2025) (en banc); *Demkovich v. St. Andrew the Apostle Parish*, 3 F.4th 968 (7th Cir. 2021) (en banc); *Bryce v. Episcopal Church*, 289 F.3d 648 (10th Cir. 2002).

But Appellants' allegations confirm both the religious nature of the counseling at issue and that there is no "neutral" way to resolve their entangling claims. Civil courts cannot define how a "reasonable chaplain" should provide "reasonable counseling" about inherently religious issues. Even to try would permanently harm chaplaincy counseling.

Below, Amici make three points. Section I explains that the Army chaplaincy is a religious institution and that all chaplain counseling is provided as a representative of the chaplain's religion. Section II explains that the church autonomy doctrine is a matter of constitutional structure and its application should be resolved at the threshold of a case, as the district court did below. And Section III explains that the district court properly found that this structural protection bars Appellants' claims.

## ARGUMENT

### I. The U.S. military's history and modern practices confirm that chaplains' status and functions are inherently religious.

From the Founding to the present, chaplains have been trusted because of who they are: religious ministers who exist to meet the religious needs of soldiers. Whether calming soldiers' fears in combat, comforting patients in hospital wards, or guiding soldiers through trauma, chaplains have acted not in spite of their faith, but because of it. Both history and modern regulations confirm that a chaplain's spiritual calling and pastoral care are inseparable. Appellants' attempts to unravel them both misunderstand and threaten the chaplaincy's religious nature.

4

**A. The chaplaincy exists to serve soldiers' religious needs.**

Building upon "spiritual roots" that reach "deep in[to] the pages of the Old Testament," 1 Parker C. Thompson, *From Its European Antecedents to 1791: The United States Army Chaplaincy* xi (1978), https://perma.cc/7K9R-NHBE, our young nation created the military chaplaincy to meet soldiers' varied religious needs. During the French and Indian War, then-Colonel George Washington requested that Virginia create a chaplain corps, 1 Anson Phelps Stokes, *Church and State in the United States* 268 (1950), https://perma.cc/YV2Z-J3BC, explaining that the lack of chaplains imposed a serious "hardship upon [his] Regiment," Thompson, *supra*, at 58. Virginia responded to Washington's call with an early colonial military chaplaincy. Stokes, *supra*, at 268.

That model soon went national. In 1775, the Continental Congress created the federal chaplaincy to "accomodat[e] religious practice by members of the military." *Cutter v. Wilkinson*, 544 U.S. 709, 722 (2005) (citing 10 U.S.C. § 3073, currently at 10 U.S.C. § 7073)); *accord Katcoff v. Marsh*, 755 F.2d 223, 225 (2d Cir. 1985). And just a few years later, the same Congress that drafted the First Amendment enacted a law authorizing payment for military chaplains—affirming the chaplaincy's significance within the new constitutional order, *Katcoff*, 755 F.2d at 225, and showing its "impressive historical pedigree," *United States v. Villamonte-Marquez*, 462 U.S. 579, 585 (1983).

Over the next two centuries, Congress repeatedly reaffirmed the chap-laincy's religious role, expanding it to meet the evolving religious needs of a growing military. *See, e.g.*, An Act Regulating the Staff of the Army, ch. 61, § 2, 3 Stat. 426 (1818) (regulating chaplains serving at West Point); Cong. Globe, 25th Cong., 1st Sess. 134 (1838) (appropriating chap-lains for the Army and specifying their duties); U.S. Dep't of War, Army Reg. 60-5 (Feb. 15, 1924), https://perma.cc/V8C9-PMMC (establishing the chaplaincy as its own corps). The modern chaplaincy remains crucial to protect "the right[s] of [servicemembers] to observe the tenets of their religion[s]," DoDI 1300.17 § 1.2 (effective Sep. 1, 2020), https://perma.cc/5X84-AC58, particularly given the "increased needs for religion" that soldiers experience "as the result of being uprooted from their home environments, transported often thousands of miles to terri-tories entirely strange to them, and confronted there with [unique] stresses." *U.S. Navy Seals 1-26 v. Biden*, 27 F.4th 336, 346 (5th Cir. 2022) (quoting *Katcoff*, 755 F.2d at 227); *see also* National Defense Authoriza-tion Act for Fiscal Year 2013, Pub. L. No. 112-239, § 533 (2013) (providing protections for "conscience, moral principles, [and] religious beliefs" of servicemembers and enhanced protections for chaplains).

## B. Chaplains serve as formal ecclesiastical representatives of their particular faith groups.

To support that mission, every chaplain holds a "dual role"—at once a "professional military religious leader," providing for soldiers' free

exercise of religion, and a "professional military religious staff advisor," advising the command on moral, ethical, and religious matters. U.S. Dep't of the Army, Army Reg. 165-1 § 2-3(b) (effective July 23, 2015), https://perma.cc/82WZ-MB8V; *see also* DoD Directive 1304.19 § 4.1 (effective June 11, 2004), https://perma.cc/XC3H-72UJ (Appointment of Chaplains for the Military Departments). At all times, each chaplain serves as a designated representative of his or her faith group, specifically endorsed by his or her ecclesiastical body as a faithful representative of their shared religion. Army Reg. 165-1 §§ 6-14(b), 8-9; *see also* Act of July 22, 1861, ch. IX, § 9, 12 Stat. 270 (establishing the ecclesiastical-endorsement requirement).

The requirement ensures chaplains can meet soldiers' religious needs. For instance, Catholic soldiers can receive certain sacraments only from a "validly ordained priest." *See* 1983 *Code of Canon Law* 900 § 1 (Eucharist); Canon 965 (penance); Canon 1003 § 1 (anointing of the sick). To ensure those soldiers can exercise their religion, the Army relies on the Catholic Church to identify—or "endorse"—validly ordained priests to become Army chaplains. Army Reg. 165-1 §§ 6-14(b), 8-9(a).

This requirement lasts throughout a chaplain's career. If a chaplain loses his or her "ecclesiastical endorsement," he or she "cannot continue to function as a chaplain," *id.* § 6-14(b), and "must immediately cease from all religious support," *id.* § 8-9(a). "Under no circumstances will the chaplain perform any chaplain functions without a valid ecclesiastical

7

endorsement." *Id.* Without endorsement, the chaplain "will undergo involuntary separation" from the Army. *Id.* § 8-9(b)(1). Thus, chaplains always serve as official religious representatives of their faith groups.

Of course, chaplains do not just serve members of their own faiths. They support a "religiously diverse population," DoD Directive 1304.19 § 4.2, and are duty-bound to respectfully provide for the "nurture and practice of religious beliefs, traditions, and customs in a pluralistic environment to strengthen the religious lives of Soldiers and their Families"—including those who do not share their beliefs, Army Reg. 165-1 § 3-2(a). *See also id.* §1-6(b)-(c). Thus, a Catholic chaplain should support a Jewish soldier's needs by, for instance, helping provide access to kosher diets. *Id.* § 1-6; *see also* U.S. Dep't of the Army, Army Reg. 600-20 § 5-6(c)(3)(d)(2) (effective July 24, 2020), https://perma.cc/C8W3-AYEZ (noting dietary-accommodation policy). And if a Jewish chaplain isn't available to lead worship or observe holy days, the Catholic chaplain will help provide access to lay leaders or local synagogues.

What he cannot do, though, is violate the "tenets of [his] religion" or those of his Jewish soldiers by presuming to perform their worship services in the role of a rabbi. Army Reg. 165-1 § 3-5(b); *see also* 10 U.S.C. § 8221(a) (a chaplain "conduct[s] public worship according to the manner and forms of the church of which he is a member"). That would undermine his value as an authentic representative of the "religious tradition" of his faith group. Army Reg. 165-1 § 1-6(b).

## C. Chaplains' functions are religious in nature.

Chaplains serve the "religious needs" of personnel by providing "comprehensive religious support." Army Reg. 165-1 §§ 3-3 (2)(b), 1-6(b). By statute, chaplains must hold regular "religious" worship services and "religious" burial services for faithful soldiers who die while serving. 10 U.S.C. §§ 7217, 9217. And required religious support also includes such "essential elements of religion" as "worship, religious rites, sacraments and ordinances, holy days and observances, … and religious education." Army Reg. 165-1 § 2-3(a). Of special relevance here, it also includes "pastoral care and counseling." *Id.*

Soldiers trust chaplains as spiritual counselors precisely *because* they are not merely Army officers but authentic religious ministers who are "motivated by[] the unique and vital role of religion." 1 Medical Department, United States Army, *Neuropsychiatry in World War II: Zone of Interior* 697 (1966), https://perma.cc/G48J-PS4B. That role intensifies in wartime, when the existential stakes of military service become "stark." Thompson, *supra*, at 61, *see also id.* at 91 (describing how one Revolutionary War-era chaplain counseled soldiers during battle); *see also* 2 Herman Norton, *The United States Army Chaplaincy 1791-1865* 13, 69-70, 115-17 (1977), https://perma.cc/J28U-R9Z2 (outlining chaplaincy ministry to injured and dying soldiers). It is also heightened, as here, during times of separation from family. *Katcoff*, 755 F.2d at 228.

Chaplains' religious identity has enabled them to "Nurture the Living, Care for the Wounded and Honor the Fallen," Army Reg. 165-1 § 2-3(c), guiding soldiers through grief and crisis across generations, Medical Department, *supra*, at 696-98. *See also Ramirez v. Collier*, 595 U.S. 411, 427-28 (2022) (noting General Washington allowed "prisoners under sentence of death" to "be attended with such Chaplains, as they choose"). Their "love for God and … love for [their] fellowman" uniquely equip chaplains to address a range of problems in ways secular counselors cannot. Medical Department, *supra*, at 696. "Tell it to the chaplain" has thus long been a common refrain in military life—a testament to the trust earned through the chaplaincy's faith-based presence and care. *Id.*

## II. The church autonomy doctrine operates as a threshold constitutional limitation on judicial interference in religious matters.

The First Amendment's Religion Clauses guarantee religious institutions a "broad" sphere of autonomy to make decisions about "faith and doctrine and … closely linked matters of internal government" without civil court interference. *Our Lady*, 591 U.S. at 747. To preserve chaplains' religious independence in their role as ecclesiastical representatives, application of the church autonomy doctrine must be resolved at the earliest possible stage of a case—as the district court properly did below.

## A. The church autonomy doctrine is a structural limitation on the power of the government in religious matters.

Church autonomy "has deep roots in the history of Western civilization." *Catholic Charities*, 145 S. Ct. at 1596 (Thomas, J., concurring). It is a "structural" protection, *Whole Woman's Health v. Smith*, 896 F.3d 362, 373 (5th Cir. 2018), that "lies at the foundation of our political principles" and safeguards the "relations of church and state under our system of laws," *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 727-28 (1872). And it is "a *threshold* structural bar that must be reckoned with" at the earliest opportunity to prevent unnecessary entanglement in religious affairs. *Huntsman*, 127 F.4th at 800 (Bumatay, J., concurring in the judgment).

The Supreme Court has held that "civil courts must exercise no jurisdiction over subject-matters that are ecclesiastical in … character." *Catholic Charities*, 145 S. Ct. at 1603 (Thomas, J., concurring) (cleaned up) (quoting *Watson*, 80 U.S. at 733). But because the term "jurisdiction" is often used "without a due regard to precision in its application," *Watson*, 80 U.S. at 732, this Court has stated that it is "somewhat unclear" whether the Religion Clauses create a formal "jurisdictional bar requiring dismissal under Fed. R. Civ. P. 12(b)(1) or an affirmative defense requiring dismissal under Fed. R. Civ. P. 12(b)(6)." *McRaney v. NAMB*, 966 F.3d 346, 348 n.1 (5th Cir. 2020); *see also McRaney v. NAMB*, 980 F.3d 1066, 1080-82 (5th Cir. 2020) (Oldham, J., dissenting from denial of en banc rehearing) (collecting cases on both sides of the issue); *accord*

*Huntsman*, 127 F.4th at 810-11 (Bumatay, J., concurring in the judgment) (collecting articles); *see also* ROA.207 (acknowledging this Court's reservation of the issue, and dismissing the case under Rule 12(b)(1)).[3]

But regardless of whether church autonomy is a formal jurisdictional bar, its structural nature and underlying purpose mean it functions like one. The line between temporal matters (subject to civil jurisdiction) and spiritual matters (subject to ecclesiastical jurisdiction) "is an ancient one." *McRaney*, 980 F.3d at 1077 (Oldham, J., dissenting from denial of en banc rehearing). It dates back to Jesus's "render[ing] 'unto Caesar the things which are Caesar's; and unto God the things that are God's.'" *Catholic Charities*, 145 S. Ct. at 1596 (Thomas, J., concurring) (quoting *Matthew* 22:21). It was embedded in "[p]re-founding English law." *Id.* at 1597. And after "the First Amendment was adopted 'against this background,'" it was reinforced by the early Supreme Court's "protections for church autonomy." *Id.* (collecting 19th-century cases).

---

[3]   A footnote in *Hosanna-Tabor v. EEOC* stated that the ministerial exception—a component of the broader church autonomy doctrine—is not a "jurisdictional bar," but instead operates as an "affirmative defense." 565 U.S. 171, 195 n.4 (2012). But because the footnote "is not technically binding precedent" and the ministerial exception and the church autonomy doctrine aren't co-extensive, some courts have continued to treat church autonomy as jurisdictional under *Watson*. Lael Weinberger, *Is Church Autonomy Jurisdictional?*, 54 Loy. U. Chi. L.J. 471, 497-509 (2022) (collecting cases). In any event, even in the ministerial exception context, the footnote does not "cast doubt on the exception's structural basis, or its importance in partitioning civil authorities from religious ones." *Billard v. Charlotte Catholic High Sch.*, 101 F.4th 316, 326 (4th Cir. 2024).

In short, "[c]onstitutional text, history and tradition, and precedent *all* confirm that the doctrine has structural roots," *Huntsman*, 127 F.4th at 811 (Bumatay, J., concurring in the judgment), as this Court and others have acknowledged. *See, e.g.*, *Whole Woman's Health*, 896 F.3d at 373 ("structural"); *Billard*, 101 F.4th at 326 ("structural nature"); *Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829, 836 (6th Cir. 2015) ("structural"); *C.L. Westbrook, Jr. v. Penley*, 231 S.W.3d 389, 397-98 (Tex. 2007) ("structural restraint on the constitutional power of civil courts to regulate matters of religion").

### B. Addressing church autonomy issues at the threshold is necessary to avoid crossing structural church-state lines.

Treating this structural defense as a "threshold matter" is not just analytically accurate, but practically necessary. *Kirby v. Lexington Theological Seminary*, 426 S.W.3d 597, 609 (Ky. 2014). Courts cannot even "emcee religious disputes, much less decide them," *Huntsman*, 127 F.4th at 800 (Bress, J., concurring), meaning that tardy resolution of whether a dispute *is* religious exposes churches to the "inherently coercive" effect of judicial "investigation and review" on religious matters. *Combs v. Cent. Tex. Ann. Conf.*, 173 F.3d 343, 347, 350 (5th Cir. 1999).

Courts accordingly treat the church autonomy doctrine as a threshold question in several practical ways. For instance, where possible, courts "resolv[e] the question of the [church autonomy] doctrine's applicability early in litigation" to "avoid excessive entanglement in church matters."

*Bryce*, 289 F.3d at 654 n.1; *see, e.g.*, *Demkovich*, 3 F.4th at 973, 985 (ordering dismissal on interlocutory appeal under 28 U.S.C. § 1292(b)); *Cannata v. Catholic Diocese of Austin*, 700 F.3d 169, 172, 177 (5th Cir. 2012) (affirming dismissal). Where some proceedings are necessary to determine applicability, courts often bifurcate discovery and then resolve church autonomy defenses first, recognizing that "the First Amendment generally prohibits merits discovery and trial" in church autonomy cases because "the process of judicial inquiry" into matters such as church governance constitutes "unconstitutional judicial action." *Markel v. Union of Orthodox Jewish Congregations*, 124 F.4th 796, 808-10 & n.5 (9th Cir. 2024). And when a district court denies application of church autonomy's protection on legal grounds, that denial can sometimes be subject to immediate appellate review. *See, e.g.*, *Whole Woman's Health*, 896 F.3d at 373. Notably, interlocutory review is available in both courts that recognize church autonomy as jurisdictional, *see, e.g.*, *In re Diocese of Lubbock*, 624 S.W.3d 506, 519 (Tex. 2021), and those that don't, *see, e.g.*, *St. Joseph Catholic Orphan Soc'y v. Edwards,* 449 S.W.3d 727, 737 (Ky. 2014).

Perhaps most telling is how courts have responded when parties don't invoke church autonomy as a defense at all—or even when parties expressly waive it. For a typical affirmative defense, that would be the end of the road: courts have no duty, and sometimes no authority, to make a party's arguments for it. *See, e.g.*, *Johnson v. Collier*, 137 F.4th 376, 383 (5th Cir. 2025). But for a church autonomy issue, just as for jurisdictional

questions, *Capron v. Van Noorden*, 6 U.S. (2 Cranch) 126, 127 (1804), courts have repeatedly held that they can *sua sponte* resolve the issue to respect constitutional limits on their authority.

That's because courts have a duty "independent of party preference" to avoid being drawn into entangling religious disputes they have neither competence nor authority to resolve. *Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036, 1042 (7th Cir. 2006). This independent duty is "rooted in constitutional limits on judicial authority" and implicates "structural concerns regarding separation of powers"—concerns that set an obligation for courts to ensure that they "limit[]" themselves "to their proper sphere." *Billard*, 101 F.4th at 325-26; *see, e.g.*, *Lee v. Sixth Mount Zion Baptist Church*, 903 F.3d 113, 118 & n.4 (3d Cir. 2018) (addressing church autonomy *sua sponte*); *Conlon,* 777 F.3d at 836 (rejecting waiver because right is "categorical" and "structural" bar on judicial interference); *EEOC v. Catholic Univ.*, 83 F.3d 455, 460 (D.C. Cir. 1996) (affirming district court's *sua sponte* resolution of church autonomy defense). And it aligns church autonomy with other structural constitutional defenses that receive similar threshold resolution, *United States v. Trump*, 91 F.4th 1173, 1186-88 (D.C. Cir. 2024) (collecting cases), *vacated on other grounds*, 603 U.S. 593 (2024), while also respecting religious bodies' "special solicitude" under the First Amendment, *Hosanna-Tabor*, 565 U.S. at 189.

Here in particular, failing to recognize church autonomy as a structural bar would result in a counterintuitive conclusion: Appellants could subject Chaplain Johnson-Glassel to suit for merely counseling Mrs. Winder to ask for a wellness check, despite that they cannot subject the police to suit for implementing the wellness check in a way that ended in Mr. Winder's death. *See Winder v. Gallardo*, 118 F.4th 638 (5th Cir. 2024) (per curiam) (affirming district court's dismissal of Petitioners' warrantless-entry and excessive-force claims against Deputy Gallardo on qualified-immunity grounds). As both a doctrinal and practical matter, this Court should recognize that the First Amendment is at least as protective against religiously entangling suits as the judge-made qualified-immunity doctrine is of suits implicating police misconduct.

* * *

In sum, whether jurisdictional or not, the "structural" nature of church autonomy, *Whole Woman's Health*, 896 F.3d at 373, means that the district court's resolution of the church autonomy issues at the threshold was appropriate. *See, e.g.*, *Petruska v. Gannon Univ.*, 462 F.3d 294, 302-03 (3d Cir. 2006) (affirming district court's 12(b)(1) church-autonomy-based dismissal under 12(b)(6)).

## III. The church autonomy doctrine bars the claims in this case.

Here, the district court correctly held that the church autonomy doctrine bars Appellants' negligent-chaplain-counseling claims. Chaplain counseling for soldiers about issues of marital strain, alcohol abuse, and

self-harm is an inescapably religious function. And Appellants' allegations confirm there's no "neutral" way for secular courts to slice and dice the "spiritual" and "secular" nature of pastoral guidance in a private counseling session with a minister. Second-guessing such guidance would also permanently chill chaplains, forcing them to conduct even emergency counseling with an eye on liability threats. That's why church autonomy preserves "independent authority" for religious bodies over matters of "teaching[] and counseling." *Our Lady*, 591 U.S. at 747.

Appellants do not identify a single similar case involving a chaplain in the entirety of our nation's history. *Cf.* Br.29 (identifying case permitting *civilian's* legal-malpractice claim for Air Force *attorney's* negligent *legal* advice regarding underlying *medical-malpractice* injury). Instead, Appellants say the First Amendment is irrelevant if this Court casts their negligent-chaplain-counseling claims in the vernacular of "neutral tort principles." Br.39. But the so-called "neutral principles" approach is designed to *aid*, not evade, church autonomy in discrete religious property disputes. Stretching it across all manner of civil tort claims would undermine the very church autonomy principles it was designed to serve.

## A. The church autonomy doctrine bars Appellants' negligent-chaplain-counseling claims.

Church autonomy bars tort claims against religious defendants if such claims touch upon matters of religious governance, belief, and practice. Appellants' negligent-chaplain-counseling claims do just that.

17

### 1. The church autonomy doctrine bars tort claims that interfere in religious matters.

Because the church autonomy doctrine both recognizes a right that protects religious independence over doctrine and internal governance and imposes a structural limitation on civil courts, it applies just as much to tort claims involving religious questions and internal church governance as to property disputes and ministerial decisions.

To be sure, religious organizations can be liable for tort claims that do not involve religious questions or internal governance whatsoever. That can include slip-and-falls, *Marchese v. St. Martha's Roman Catholic Church*, 965 N.Y.S.2d 557, 558-59 (N.Y. App. Div. 2013), or car accidents, *Garber v. Scott*, 525 S.W.2d 114, 119-20 (Mo. Ct. App. 1975).

But here, Appellants argue that church autonomy applies only in matters of "religious training, faith, and beliefs." Br.43. This Court and the Texas Supreme Court have rejected the idea that church autonomy is limited to cases that require "interpretation of religious doctrine." *Simpson v. Wells Lamont Corp.*, 494 F.2d 490, 493 (5th Cir. 1974). Rather than "such a strict" and "narrow[]" view, this Court recognized that church autonomy encompasses "matters of church *government* as well as those of faith and doctrine." *Id.* at 493 (emphasis added). Considering only whether "theological question[s]" are challenged, then, "goes to only one area of constitutional concern and ignores another"—the "church's authority to manage its own affairs." *Westbrook*, 231 S.W.3d at 397.

So tort law, under church autonomy, can't reach claims arising from the substance of pastoral counseling provided by a minister in his religious capacity, which inescapably "implicates ecclesiastical matters." *Starkey v. Roman Catholic Archdiocese of Indianapolis*, 41 F.4th 931, 943-45 (7th Cir. 2022); *accord Paul v. Watchtower Bible & Tract Soc'y of N.Y.*, 819 F.2d 875, 880 (9th Cir. 1987) (barring tort claims where liability would "abridge[] … free exercise"). Nor do "[r]eligious disputes restated in the elements of a [tort] claim … lose their inevitably religious character, just as employment disputes involving persons with religious duties cannot be regarded as purely secular, either." *Huntsman*, 127 F.4th at 798 (Bress, J., concurring); *see also Payne-Elliott v. Roman Catholic Archdiocese of Indianapolis*, 193 N.E.3d 1009, 1014-15 (Ind. 2022) (rejecting tort claim where "the complaint rests on communications between church officials and members" on internal religious matters).

## 2. Appellants' negligent-chaplain-counseling tort claims are barred by church autonomy.

Appellants' arguments violate these principles here. Appellants insist that the church autonomy doctrine does not bar negligence claims *against* religious leaders, *by* those who sought their spiritual counsel, *over* the content of internal communications about matters of ecclesiastical importance, *if* lawyers and judges can, after the fact, frame the chaplain's counsel as "secular." That's incorrect.

To prove negligence, the plaintiff must show that the defendant breached a duty of care. *IHS Cedars Treatment Ctr. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004). According to Appellants, Chaplain Johnson-Glassel owed a duty to "give proper and reasonable advice" under the standard of care of a "trained Army Chaplain" acting as a "spiritual adviser" "in the scope of his employment as a member of the United States Army Chaplain Corps"—including not to "misuse his chaplaincy power and authority" in providing counsel on sensitive religious and moral issues. ROA.12-14; ROA.32-33.[4] Appellants assert that Chaplain Johnson-Glassel's counseling regarding Mr. Winder's accusations of marital infidelity, drunkenness, and suicide threats constituted "unreasonable advice" violating the Chaplain's "duty of confidentiality" and "the applicable code of ethics in rendering spiritual advice, comfort, and guidance," and that he should have brought a "local pastor" into the situation as well. ROA.32-34.

Adjudicating whether the guidance that Chaplain Johnson-Glassel provided was "proper and reasonable" would plunge this Court into a "religious thicket." *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 719 (1976). For one, it would require a civil court (and perhaps a jury) to evaluate whether the chaplain properly interpreted and applied

---

[4]  In their briefing on appeal (but not their Complaint), Appellants primarily refer to Chaplain Johnson-Glassel by his rank of "Captain." That is mistaken. Chaplains aren't identified primarily by their rank, but by their religious title: "Chaplain."

his faith's religious training and beliefs when providing religious support on matters steeped in religious doctrine and moral teachings. It would question the religious source and meaning of the chaplain's guidance, the inner workings of how that chaplain counseling session was carried out against a typical "reasonable" one, the mind of a particular chaplain endorsed by a specific religious organization in such circumstances, and the ecclesiastical endorser's own standards.

Under the church autonomy doctrine, however, "[t]he contours of the ministerial relationship are best left to a religious organization, not a court," especially where "[r]eligion permeates" the role. *Demkovich*, 3 F.4th at 979. The doctrine avoids "forc[ing] [courts] to interpret" such entangling questions "to determine whether or not a statement had a religious meaning." *Pfeil v. St. Matthews Evangelical Lutheran Church*, 877 N.W.2d 528, 538 (Minn. 2016). For good reason: "[n]othing says 'entanglement with religion' more" than adjudicating whether a pastor "should have spoken with greater precision about inherently religious topics." *Huntsman*, 127 F.4th at 798 (Bress, J., concurring).

Further, Appellants' spiritual-to-secular continuum is based on flawed assumptions. A "religious institution's decisions should not be delineated between 'religious' and 'secular'" since, "even if facially secular," they are "often intertwined with religious doctrine." *Markel*, 124 F.4th at 808, 810. That's doubly true here, where even if an issue *seems* secular, a minister's "handling of [the] subject [may] not [be]." *NLRB v. Catholic Bishop*, 440

U.S. 490, 501 (1979). And because "[d]elineating a religious organization's decisions between religious and secular would create excessive entanglement," Appellants' "distinction not only lacks constitutional significance but would lead to unconstitutional judicial action." *Markel*, 124 F.4th at 808, 810.

Appellants' arguments also ignore the chaplaincy context. The Army has defined counseling as an "essential element[] of religion" provided by chaplains, Army Reg. 165-1 § 2-3, and a core means by which chaplains fulfill their religious duty of pastoral care. *See* U.S. Dep't of the Army, Pam. 600-3 § 39-2(b)(6) (Dec. 3, 2014), https://perma.cc/ME3X-7M55 (Chaplains "[o]ffer pastoral care through counseling and advising."). Although such counseling covers a broad "range of activities," no matter the topic, it is always guided by the chaplain's religious faith. Army Reg. 165-1 § 16-1. A chaplain may not even provide counseling without authorization from his or her "respective religious-endorsing organization." DoDI 1304.28 § 3.1(g) (effective May 8, 2024), https://perma.cc/VE6Z-QF26. And when a chaplain guides servicemembers through "crisis interventions" or advises on "ethical and moral issues," he or she performs the chaplaincy's "Religious Support" function—that is, "facilitat[ing] [the] free exercise of religion through … counseling services." U.S. Dep't of the Army, Field Manual 3-83 (1-05) § 1-5 (Apr. 11, 2025), https://perma.cc/3QXF-5SBL. Congress recognizes this, too. Chaplains' religious functions—including counseling—are broadly protected by

federal law from government interference. *See* National Defense Authorization Act for Fiscal Year 2013, Pub. L. No. 112-239, § 533 (2013).

This is also true of the chaplaincy's role in suicide prevention. Chaplains are entrusted with the "spiritual fitness components for suicide prevention." U.S. Dep't of the Army, Army Reg. 600-92 § 1-21(i)(8) (effective Sep. 8, 2023), https://perma.cc/RH4N-VPSH (Army's Suicide Prevention Program). Chaplaincy regulations identify "spiritual beliefs" as a protective factor against suicide, *id.* at 2–6(b)(2), and recognize spiritual issues as relevant in suicide risk assessments, *id.* at Table H-1. Indeed, Army chaplains are charged with providing "religious support" for the issues at the heart of this case: "[f]amily and personal matters" such as "suicidal ideation, at risk behaviors such as alcohol and drug abuse, and marital and parenting stressors." U.S. Dep't of the Army, Army Techniques Publication 1-05.04 (Mar. 23, 2017), https://perma.cc/J79D-YSQ5. For chaplains, these functions can hardly be described as "purely secular." Br.38.

Appellants' assertion that Chaplain Johnson-Glassel "owed [Winder] a duty of confidentiality," Br.41, just proves the point. Confidentiality only arises when a soldier speaks "to a clergyman in the clergyman's capacity as a spiritual advisor" and does so "as a formal act of religion or as a matter of conscience." ROA.11-12 (quoting Army Reg. 165-1, § 16-2); *see also* ROA.12-14; ROA.144-45. And Appellants ask the Court to adjudicate negligence based on a code of *spiritual* ethics that applies "during the conduct of [chaplains'] ministry" in recognition of their "ministerial

office." ROA.11, 33, 75 (quoting *Covenant and Code of Ethics for Chaplains of the Armed Forces*). Again, then, whatever else they may be, these are not "purely secular" matters.

Indeed, counseling is not so neat and tidy that the relationship between "spiritual" counsel about infidelity and "secular" counsel about resulting self-harm within the same (emergency) conversation can be probed without substantial religious entanglement. *See Westbrook*, 231 S.W.3d at 391-92 (declining to "pars[e]" defendant's "roles" as pastor and counselor for negligence claim); *Pfeil*, 877 N.W.2d at 538 (identifying the entanglement inherent in a "statement-by-statement analysis" even where certain "statements seem more secular in nature"). And such slicing and dicing would put a "significant burden" on chaplains to predict "on pain of substantial liability" which aspects of their counseling "a secular court will consider religious." *Corp. of Presiding Bishop v. Amos*, 483 U.S. 327, 336 (1987). That kind of "searching case-by-case analysis" into whether specific words offered by a chaplain in the midst of emergency counseling are "religious or secular" would result in "chilling" the chaplaincy's counsel for all soldiers. *Id.* at 343-44 (Brennan, J., concurring).

Because Appellants' theory of the standard of care for a "trained Army Chaplain" in offering advice within the scope of his ministerial role is "inextricably intertwined" with ecclesiastical matters, *Diocese of Lubbock*, 624 S.W.3d at 517, the church autonomy doctrine bars their claim.

## B. The "formal title" or "neutral principles" approach is a tool meant to serve church autonomy—not swallow it.

Appellants argue that tort claims against chaplains and other religious officials for allegedly substandard counseling can and must be evaluated under the "neutral principles of law" approach. Br.27-29. That mistaken view would distort the entire church autonomy doctrine, as this Court has previously recognized. *See, e.g.*, *Simpson*, 494 F.2d at 493.

### 1. Appellants' property rule is inapplicable.

Originally labeled the "'formal title' doctrine," the so-called "neutral principles" approach was recognized to support standard church autonomy principles for the unique problem of "resolving litigation over religious property." *Md. & Va. Eldership of Churches of God v. Church of God*, 396 U.S. 367, 370 (1970) (Brennan, J., concurring); Michael W. McConnell & Luke W. Goodrich, *On Resolving Church Property Disputes*, 58 Ariz. L. Rev. 307, 317 (2016) ("'Formal title' seems a more precise description of the approach, because everyone claims their approach is neutral in some sense."). Such cases do not necessarily "present a conflict between the civil law and an internal church decision; they present a conflict between two church entities over what the church's decision was in the first place." McConnell & Goodrich, *supra*, at 336. The "formal title" approach was meant to *serve* church autonomy in that narrow context, not supplant it across the board.

The approach was explicitly "developed for use" to adjudicate intra-church property disputes, *Presbyterian Church v. Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449 (1969), in situations where the disputes do not raise ecclesiastical issues. *See Jones v. Wolf*, 443 U.S. 595, 597 (1979). Within the broader and "general" doctrine of "church autonomy," *Our Lady*, 591 U.S. at 747, the Supreme Court has "narrowly drawn" this "neutral principles" approach, using it exclusively in the church-property context. *Westbrook*, 231 S.W.3d at 398 (citing *Milivojevich*, 426 U.S. at 709). That context—where there is a "conflict between two church entities over what the church's decision was in the first place"—is "fundamentally different" from using "external legal restrictions," like civil tort claims, "to thwart the church's decision[s]." McConnell & Goodrich, *supra*, at 336.

The Supreme Court's limited use of "neutral principles" was specifically meant to serve broader church autonomy interests. In the context of a church-schism-driven property dispute, "[t]he method relies exclusively on objective, well-established concepts of trust and property law familiar to lawyers and judges," and thus in some circumstances could avoid religious "entanglement." *Wolf*, 443 U.S. at 603. But beyond that, courts typically lack such well-established legal principles necessary to make them "institutionally competent to discern which communications merely bear on the 'facts' and which communications interfere with a religious body's free exercise." *Whole Woman's Health*, 896 F.3d at 372.

A rule designed for dealing with churches split into two factions and fighting over property ownership isn't applicable here. Indeed, the church autonomy doctrine's purpose is to *prevent* "neutral" laws from "interfer[ing] with an internal church decision that affects the faith and mission of the church itself." *Hosanna-Tabor*, 565 U.S. at 190. Just so, the Supreme Court has never once applied the "neutral principles" approach outside of the schismatic property context. *See, e.g.*, *Simpson*, 494 F.2d at 493 (5th Cir. 1974) (recognizing the Supreme Court's "cases negative" the "strict view" that "neutral principles of law" approach "narrowly limit[s] ecclesiastical disputes to differences in church doctrine"); *Hutchison v. Thomas*, 789 F.2d 392, 396 (6th Cir. 1986) ("neutral principles" approach "has never been extended to religious controversies in the areas of church government, order and discipline, nor should it be"). And not for lack of opportunity.

The Supreme Court has repeatedly refused to apply the "neutral principles" approach in other areas. For instance, *Milivojevich* rejected "reli[ance] on purported 'neutral principles'" to review "a matter of internal church government," because such matters were "obviously" beyond the "competence" of "[c]ivil judges." 426 U.S. at 714-15 & n.8. That was so even though church property *was* at issue: the former bishop suing the Serbian Orthodox Church argued that because his defrocking affected who had control over church *property*, the dispute could be adjudicated by neutral principles of law. *Id.* at 706-07, 714-15 & n.8, 720. And, more

recently, *Hosanna-Tabor* rejected multiple arguments that non-property religious disputes are governed by "neutral" laws such as employment-discrimination statutes, since "select[ing] and control[ling] who will minister to the faithful" is "strictly ecclesiastical" and part of the "internal governance of the church." 565 U.S. at 188-90, 195. *Contra* Br. for Fed. Resp't at 25-28, *Hosanna-Tabor*, 565 U.S. 171 (arguing neutral principles applied beyond the context of church-property cases); Br. for Resp't Perich at 45-48, *Hosana-Tabor*, 565 U.S. 171 (urging the court to widely apply neutral principles). Thus, it is the "broad principle" of church autonomy that governs judicial analysis of "matters of internal government," *Our Lady*, 591 U.S. at 747, not the "narrow" church-property application.

### 2. Appellants mistake this Court's precedent.

Disagreeing, Appellants selectively rely on two of this Court's decisions. The first is *Sanders v. Casa View Baptist Church*, 134 F.3d 331 (5th Cir. 1998). But *Sanders* agreed that "the Free Exercise Clause protects religious relationships, including the counseling relationship between a minister and his or her parishioner, primarily by preventing the judicial resolution of ecclesiastical disputes turning on matters of 'religious doctrine or practice.'" *Id.* at 336. It further agreed that defining the "relevant standard of care" in such cases would be unacceptably entangling. *Id.* at 337.

So Appellants are once again left inviting the Court to parse religiously rooted counseling for "secular" bits and pieces. Br.27-31, 33-38. Appellants rely heavily on *Sanders*'s suggestion in *dicta* that the Religion Clauses do not "extend constitutional protection to the secular components of [religious] relationships." Br.27 (quoting 134 F.3d at 335-36). But *Sanders*'s statement rested on the now-defunct *Lemon* supposition that free exercise "cannot be construed to protect *secular* beliefs and behavior" that "comprise part of an otherwise religious relationship," because that would "impermissibly" "favor[] religion over nonreligion." *Sanders*, 134 F.3d at 336 (citing *County of Allegheny v. ACLU,* 492 U.S. 573, 593-94 (1989) (applying "the *Lemon* analysis")). The Supreme Court has expressly repudiated that "ahistorical approach." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 534 (2022) (recognizing *Allegheny* as "long ago abandoned"); *accord Freedom from Religion Found. v. Mack*, 49 F.4th 941, 954 n.20 (5th Cir. 2022) ("We do not … consider the *Lemon* test."). And it has confirmed that the text of the First Amendment affords religious bodies' "special solicitude." *Hosanna-Tabor*, 565 U.S. at 189.

Second, Appellants invoke this Court's panel decision in *McRaney* as if it departs from controlling church autonomy principles for all claims sounding in tort. Br.37, 41-43. Not so: *McRaney* agrees that all "'[m]atters of church government, as well as those of faith and doctrine' constitute *purely ecclesiastical questions*" on which "judicial review" is barred. 966 F.3d at 348. And to the extent *McRaney* relied on the same abandoned

*Lemon* analysis that *Sanders* did, *see id.* at 348-49, that reliance fails under *Kennedy* and *Mack*.

Regardless, *McRaney* is distinguishable. What was lacking "at [the pleading] stage" in *McRaney* was clarity on whether there was any hint of "purely ecclesiastical questions." 966 F.3d at 349-51. But here, as shown in detail above, Appellants "candidly" alleged ecclesiastical questions and their theory of confidentiality turns entirely on religious matters. Br.33-34, 61-62; ROA.11-12. And that candor was inescapable. There's a reason that in 250 years, no federal court has ever tried to separate the religious wheat from the secular tares in the context of an Army chaplain's sincere counseling on moral issues. This case should not be the first.

## CONCLUSION

This Court should affirm under the church autonomy doctrine.

Dated: June 25, 2025

Respectfully submitted,

/s/ *Michael J. O'Brien*

DANIEL H. BLOMBERG
MICHAEL J. O'BRIEN
  *Counsel of Record*
AMANDA L. SALZ
THE BECKET FUND
  FOR RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW,
  Suite 400
Washington, D.C. 20006
mobrien@becketfund.org

*Counsel for* Amici Curiae

30

## CERTIFICATE OF SERVICE

On June 25, 2025, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with 5th Cir. R. 25.2.13; and (2) the electronic submission is an exact copy of the paper document in compliance with 5th Cir. R. 25.2.1.

/s/ *Michael J. O'Brien*
MICHAEL J. O'BRIEN

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of 5th Cir. R. 29.3 and Fed. R. App. P. 29(a)(5) because it contains 6,489 words, excluding the parts exempted by Fed. R. App. P. 32(f); and (2) the typeface and type style requirements of 5th Cir. R. 29.2 and Fed. R. App. P. 32(a)(5)-(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word (the program used for the word count).

/s/ *Michael J. O'Brien*
MICHAEL J. O'BRIEN